FILED

2010 NOV 15 PM 4:38

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA

BY_____

BY FAX

1 LIONEL Z. GLANCY (#134180)
2 MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
3 GLANCY BINKOW & GOLDBERG LLP
4 1801 Avenue of the Stars, Suite 311
Los Angeles, California 90067
5 Telephone: (310) 201-9150
6 Facsimile: (310) 201-9160
7 E-mail: info@glancylaw.com

8 *Attorneys for Plaintiff Ali Baig*
9 [Additional Counsel on Signature Page]

10 **UNITED STATES DISTRICT COURT**
11 **CENTRAL DISTRICT OF CALIFORNIA**

12

| | |
|---|---|
| 13 ALI BAIG, Individually and on Behalf of All Others Similarly Situated,<br><br>14<br>15 Plaintiff,<br>16<br>17 v.<br>18 RINO INTERNATIONAL CORPORATION, DEJUN ZOU, BEN WANG, YI LIU a/k/a JENNY LIU, and YU LI,<br>19<br>20<br>21<br>22 Defendants. | ) No. **SACV10-1754 CJC(RNBx)**<br>)<br>) CLASS ACTION<br>)<br>)<br>)<br>) **COMPLAINT FOR**<br>) **VIOLATIONS OF THE**<br>) **FEDERAL SECURITIES**<br>) **LAWS**<br>)<br>)<br>)<br>)<br>) <u>DEMAND FOR JURY TRIAL</u> |

23
24
25
26
27
28

Plaintiff Ali Baig, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by RINO International Corporation ("RINO" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by RINO; and (c) review of other publicly available information concerning RINO.

## **NATURE OF THE ACTION AND OVERVIEW**

1.   This is a class action on behalf of purchasers of RINO's securities between November 13, 2009 and November 11, 2010, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.   RINO, through its subsidiaries, operates as an environmental protection and remediation company in the People's Republic of China. The Company engages in designing, manufacturing, installing, and servicing wastewater treatment and flue gas desulphurization equipment primarily for use in the iron and steel industry; and anti-oxidation products and equipment for use in the manufacture of hot rolled steel plate products.

3.      On November 10, 2010, a research firm issued a report calling into question, among others, the Company's customer relationships, accounting, and financial results.  The research firm claimed that its investigation indicated that RINO had fabricated customer relationships, exaggerated sales, and issued phony financial statements.  In particular, the report highlighted that the same day that RINO closed a $100.0 million financing transaction, certain officers/directors "borrowed" $3.2 million from the Company to purchase a luxury home in Orange County, California.

4.      On this news, shares of RINO declined by $2.34 per share, more than 15%, to close on November 10, 2010, at $13.18 per share, on unusually high volume, and further declined another $2.08 per share, 15.08%, to close on November 11, 2010, at $11.10 per share, also on unusually high volume.

5.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that certain customers did not purchase flue gas desulfurization ("FGD") systems as the Company had previously claimed; (2) that the Company's financial results reported to China's State Administration of Industry and Commerce were substantially less than the financial results the Company reported to the public and contained in the financial statements

RINO filed with the SEC; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's financial results were materially false and misleading at all relevant times.

6.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.     Venue is proper in this Judicial District pursuant to §28 U.S.C. §1391(b), §27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Additionally, at times relevant hereto, the Company maintained an office within this Judicial District.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

11.     Plaintiff Ali Baig, as set forth in the accompanying certification, incorporated by reference herein, purchased RINO securities during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant RINO International Corporation is a Nevada corporation with its principle executive offices located at 11 Youquan Road, Zhanqian Street, Jinzhou District, Dalian, People's Republic of China 116100.  At times relevant hereto, the Company maintained an office within this Judicial District at 30211 Banderas, Suite 200, Rancho Santa Margarita, California 92688.

13.     Defendant Dejun Zou ("Zou") was, at all relevant times, President and Chief Executive Officer ("CEO") of RINO.

14.     Defendant Ben Wang ("Wang") was, at all relevant times, Chief Financial Officer ("CFO") of RINO since April 2010.

15.     Defendant Yi Liu (a/k/a Jenny Liu) ("Liu") was, at all relevant times,

---

1   CFO of RINO until April 2010.

2
3        16.     Defendant Yu Li ("Li") was, at all relevant times, Controller of RINO

4   since November 14, 2009 after having previously served as the Company's accounting

5   manager since its inception.

6
7        17.     Defendants Zou, Wang, Liu, and Li, are collectively referred to

8   hereinafter as the "Individual Defendants." The Individual Defendants, because of

9   their positions with the Company, possessed the power and authority to control the

10  contents of RINO's reports to the SEC, press releases and presentations to securities

11
12  analysts, money and portfolio managers and institutional investors, i.e., the market.

13  Each defendant was provided with copies of the Company's reports and press releases
14
15  alleged herein to be misleading prior to, or shortly after, their issuance and had the

16  ability and opportunity to prevent their issuance or cause them to be corrected.

17
18  Because of their positions and access to material non-public information available to

19  them, each of these defendants knew that the adverse facts specified herein had not

20  been disclosed to, and were being concealed from, the public, and that the positive

21
22  representations which were being made were then materially false and/or misleading.

23  The Individual Defendants are liable for the false statements pleaded herein, as those

24
25  statements were each "group-published" information, the result of the collective

26  actions of the Individual Defendants.

27
28                                                                                    6

1
2
3

# SUBSTANTIVE ALLEGATIONS

## Background

18.     RINO, through its subsidiaries, operates as an environmental protection and remediation company in the People's Republic of China. The Company engages in designing, manufacturing, installing, and servicing wastewater treatment and flue gas desulphurization equipment primarily for use in the iron and steel industry; and anti-oxidation products and equipment for use in the manufacture of hot rolled steel plate products.

## Materially False and Misleading
## Statements Issued During the Class Period

19.     The Class Period begins on November 13, 2009.  On this day the Company issued a press release entitled, "RINO International Corp. Announces Record Third Quarter 2009 Financial Results."  Therein, the Company, in relevant part, stated:

> RINO International Corp. (OTC Bulletin Board: RINO), which through its subsidiaries and controlled affiliates in the People's Republic of China (collectively, the "Company" or "RINO"), designs, manufactures, installs and services proprietary and patented wastewater treatment, desulphurization equipment, and high temperature anti-oxidation systems for iron and steel manufacturers in the People's Republic of China ("PRC"), today announced the Company's financial results for the third quarter of 2009.

SUMMARY FINANCIALS

First Quarter 2009 Results

| | Q3 2009* | Q3 2008** | CHANGE |
|---|---|---|---|
| Sales | $63.3 million | $44.9 million | +41.0% |
| Gross Profit | $26.1 million | $20.6 million | +27.1% |
| Adjusted Net Income | $19.7 million | $15.7 million | +25.5% |
| GAAP Net Income | $17.1 million | $9.9 million | +73.3% |
| Adjusted EPS (Diluted) | $0.78 | $0.62 | +25.8% |
| GAAP EPS (Diluted) | $0.68 | $0.39 | +74.4% |

*Q3 2009 included a $2.6 million non-cash charge related to the changes in the value of warrants.

**Q3 2008 included $5.8 million in non-cash equity compensation charges not present in 2009.

Adjusted Net Income and EPS are non-GAAP and utilized to illustrate operating numbers.

First Nine Months of 2009 Results

| | 2009 | 2008* | CHANGE |
|---|---|---|---|
| Sales | $139.6 million | $98.5 million | +41.7% |
| Gross Profit | $56.3 million | $43.6 million | +29.1% |
| Adjusted Net Income | $43.8 million | $31.9 million | +37.2% |
| GAAP Net Income | $39.4 million | $20.3 million | +94.5% |
| Adjusted EPS (Diluted) | $1.74 | $1.27 | +37.0% |
| GAAP EPS (Diluted) | $1.57 | $0.81 | +93.8% |

* The first nine months of 2009 included a $4.4 million non-cash charge related to changes in values of warrants.

**The first nine months of 2008 included $11.7 million in non-cash equity compensation expenses not present in 2009.

Adjusted Net Income and EPS are non-GAAP and utilized to show operating numbers.

2009 Third Quarter Financial Results

Net revenues for the third quarter ended September 30, 2009 increased 41.0% to $63.3 million as compared to $44.9 million for the third quarter in 2008. Revenue growth was driven by demand across its product lines, including a significant increase in both wastewater treatment and anti-oxidation systems and coatings sales. Specifically, the Company recorded $33.3 million in desulphurization revenues, a decrease of 11.8% from the third quarter of 2008, $15.1 million in wastewater treatment system sales, an increase of 241.9% from the third quarter of 2008, and $13.8 million in anti-oxidation equipment and coatings, an over 8-fold increase compared to the same year ago period. The Company recorded $1.1 million in machining service revenues.

Cost of sales for the third quarter of 2009 was $37.2 million as compared to $24.3 million in the same period of 2008, an increase of 52.9%. Gross profit was $26.1 million in the third quarter of 2009, a 27.1% increase from $20.6 million for the same period in 2008, representing gross margins of approximately 41.3% and 45.8%, respectively. The 4.5% variance in gross margins was mainly attributable to outsourcing, which has enabled the Company to continue growing its revenue base without significantly expanding its facility.

Total operating expenses for the third quarter of 2009 were $6.6 million, a 38.7% decrease from $10.7 million reported during the same period in 2008. The third quarter of 2008 included a non-cash stock compensation expense of $5.8 million related to a "Make Good Provision" relating to a private placement of the Company's Common Stock in 2007. Eliminating this expense, operating expenses would have increased by 35.1%, which was primarily the result of $2.4 million in commission expenses for new contracts. Operating income for the third quarter of 2009 and 2008 was $19.6 million and $9.9 million, respectively, representing operating margins of 30.9% for the third quarter of 2009 compared to the third quarter 2008 operating margin of 22.0%, or 35.0% when adjusted to eliminate the non-cash expense.

GAAP net income for the third quarter was $17.1 million, representing an increase of 73.3% as compared to $9.9 million reported in the same period in the prior year. Earnings per diluted share were $0.68 for the third quarter in 2009 as compared to $0.39 for the third quarter in 2008, which was based on 25.2 million shares outstanding. The Company did not incur any taxes during either period.

During the third quarter of 2009 the Company incurred a non-cash charge of $2.6 million for the change in the value of warrants. Adjusting for non-cash charges in each respective period, net income for the third quarter of 2009 and 2008 was $19.7 million and $15.7 million, with $0.78 and $0.62 in earnings per diluted share.

"The third quarter continued our momentum as we executed on our growth plan while making further improvements in all of our key financial metrics," stated Mr. Zou Dejun, President and CEO of RINO International. "This was the first quarter we saw meaningful uptake by customers for our anti-oxidation systems. During the quarter we performed work on a total of 12 FGD desulphurization systems, 5 wastewater treatment systems and installed 7 anti-oxidation systems for a total of 23 customers. We are excited about our DXT desulphurization system which we believe will enable us to cement our position as the leader in this particular FGD application, while providing a strong conduit for growth during the next few years as adoption accelerates. In addition, our backlog as of September 30, 2009 was approximately $52.7 million, which represents 6 desulphurization, 4 wastewater treatment and 6 anti-oxidation projects. We believe our collective growth initiatives will continue to provide incremental and robust top-line and bottom line growth and we currently expect to surpass our previous revenue estimate of $176.5 million for 2009".

2009 Nine Month Financial Results

For the first nine months of 2009 revenues increased 41.7% to $139.6 million from $98.5 million in the year ago period. FGD sales increased 18.5% to $89.1 million and represented 63.8% of total sales. Wastewater treatment equipment increased 150.1% to $31.6 million and represented

22.6% of sales. Anti-oxidation equipment and coatings increased 308.9% to $17.4 million, representing 12.5% of total sales while machining services were $1.6 million.

Cost of sales increased 51.7% to $83.4 million yielding gross profit of $56.3 million, an increase of 29.1% from $43.6 million reported in 2008. Gross margins were 40.3% compared to 44.2% during the first nine months of 2009 and 2008, respectively.

Operating expenses decreased 39.1% to $14.1 million during the first nine months of 2009 from $23.1 million in 2008, which included an $11.7 million non-cash equity compensation charge. Income from operations increased 106.2% to $42.2 million from $20.5 million with operating margins of 30.2% compared to 20.8%, or 32.6% excluding the charge.

GAAP Net income for the first nine months of 2009 increased 94.5% to $39.4 million from $20.3 million with corresponding diluted earnings per share of $1.57 compared to $0.81 in 2008 based on 25.1 million and 25.2 million diluted shares in each respective period. The Company incurred no income taxes in either period. During the first nine months of 2009 the Company incurred a non-cash charge of $4.4 million for the change in the value of warrants, with no associated charge in 2008. Adjusting for non-cash charges during each respective period, net income was $43.8 million and $31.9 million, yielding $1.74 and $1.27 in earnings per diluted share.

"Our business continues to be driven by a number of factors centered around government mandates stipulating that iron and steel manufacturers be equipped with desulphurization systems. The Chinese Ministry of Industry and Information Technology showed its commitment to support this initiative by publishing a formal plan on July 31, 2009 which prioritizes steel FGD installations, sets specific desulphurization guidelines and targets, while offering priority funding by both the central and local governments and further support for domestic based technology. This is the single most important regulatory event since our Company was formed and clears a path toward doubling

---

the number of sinters to be equipped with FGD systems annually through 2011. We expect that growth from our FGD system installations, in addition to the large Sludge Treatment System for the Dalian Government, will drive further growth during 2010."

Balance Sheet and Cash Flow Discussion

Cash and cash equivalents as of September 30, 2009 were $29.0 million, representing an increase of 47.0% as compared to $19.7 million as of December 31, 2008. Working capital on September 30, 2009 was $115.4 million for the third quarter of 2009, an increase of 62.8% from $70.9 million on December 31, 2008. Accounts receivable stood at $44.6 million, a 13.5% decrease from $51.5 million reported as of December 31, 2008. The Company reported $8.8 million in short term loans payable, maintained a current ratio of 4.7 to 1 and saw stockholder's equity increase 65.2% to $110.5 million as of September 30, 2009 as compared to $66.9 million as of December 31, 2008.

For the nine months ended September 30, 2009, the Company generated $9.5 million in cash flow from operations, as compared to $10.0 million cash used in operation for the first nine months in 2008. The variance between cash flow and net income was mainly related to $34.7 million in advances for inventory purchases as the company prepares for several large project installations and $13.2 million in costs and estimated earnings surpassing billings for projects still underway.

20.     On November 13, 2009, RINO filed its Quarterly Report on Form 10-Q with the SEC for the 2009 fiscal third quarter.  The Company's Form 10-Q was signed by Defendant Zou, and reaffirmed the Company's financial results previously announced on November 13, 2009.  The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Zou and Liu, who certified:

1.   I have reviewed this quarterly report on Form 10-Q for the period ended September 30, 2009 of RINO International Corporation;

2.   Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.   Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)   Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)   Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)      All significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)      Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

21.      On March 31, 2010, the Company issued a press release entitled, "RINO International Corp. Announces Record 2009 Revenue and Net Income." Therein, the Company, in relevant part, stated:

2009 Fourth Quarter Financial Results (unaudited)

Net revenues for the fourth quarter ended December 31, 2009 increased 29.9% to $53.0 million compared to $40.8 million for the fourth quarter in 2008. Specifically during the fourth quarter, the company recorded $27.3 million in desulphurization projects which represented 51.5% of sales and was a 9.3% decrease from the same period 2008; $14.4 million in wastewater treatment system sales, which represented 27.2% of sales and was an increase of 700% over fourth quarter 2008; $7.7 million in anti-oxidation equipment and an coatings compared, which represented 14.5% of total sales and represented an increase of 413% from the same period of 2008; and $3.6 million in machining service revenues, a decrease of 51.4% from the $7.4 million recorded in the same period 2008, and represented 6.8% of sales during the fourth quarter of 2009.

Cost of goods sold for the fourth quarter of 2009 was $36.9 million compared to $30.0 million in same period 2008, an increase of 23.0%. Gross profit was $16.1 million in the fourth quarter 2009 compared to $10.8 million for the same period in 2008, an increase of $5.3 million, and represented gross margins of approximately 30.3% and 26.4%, respectively.

Total operating expenses for the fourth quarter of 2009 were $2.9 million versus $10.0 million for the same period in 2008. Excluding the non cash equity compensation charge of $0.05 million and $6.0 million for the fourth quarter of 2009 and 2008 respectively, operating income would have been $13.2 million and $6.7 million with operation margins of 24.9% and 16.5% respectively.

GAAP net income for the fourth quarter of 2009 was $17.2 million compared to $1.0 million reported in the same period prior year. Excluding charge in equity compensation expenses of $0.05 million and change in value of warrant of $3.6 million for the fourth quarter of 2009, and non-cash charge in equity compensation expenses of $6.0 million for the fourth quarter of 2008, adjusted net income was $13.5 million compared to $7.0 million for fourth quarter of 2008. Based on 25.4 and 25.1 million shares outstanding, GAAP earnings were $0.68 and $0.04 per diluted share for the fourth quarter of 2009 and 2008, respectively.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Excluding the non-cash charge for equity compensation and change value of warrant, the Company would have reported fourth quarter diluted earnings of $0.53 per share compared to $0.28 in the year ago period.

"We are very pleased with our financial results for the fourth quarter and full year of 2009," commented Mr. Zou Dejun, President and CEO of RINO International, "During the fourth quarter of 2009, we experienced continued momentum in installations of our anti-oxidation systems and wastewater treatment systems. In addition, we completed a total of 5 FGD desulphurization systems for a total of 5 customers during the fourth quarter. We would like to extend our gratitude to all our investors for their support in the $100 million December financing, which will provide the necessary working capital to secure more projects while expanding our production capacity. To that end, we recently acquired 50-year land use rights for approximately 57.5 acres in a large scale industrial plant located in Dalian Changxing Island Harbor Industrial Zone and will build out a new facility during 2010 to be used to expand its R&D and manufacturing capabilities for a wide range of its environmental protection equipment."

\*        \*        \*

Revenue increased 27.7% to $192.6 million for the twelve months ended Dec. 31, 2009, from the $139.3 million reported in 2008, surpassing previously issued guidance of $176.5 million. Sales of Wastewater Systems increased 218.3% to $46.0 million for 2009, compared to $14.4 million in 2008. The Company recorded anti-oxidation equipment and related coatings sales of $25.1 million from nine contracts executed for 2009, as compared to revenues of $5.7 million with 2 contracts completed for 2008. This represented a year-over-year increase of $19.3 million, or 336.6%.

Gross profits for 2009 were $72.3 million compared to $54.3 million in 2008, an increase of 33.1%. Gross margins were 37.5% compared to 39.0% in 2008, which were impacted by higher subcontractor costs in 2009. Operating income for the year totaled $55.3 million, an increase

of 142.5% compared to $22.8 million in 2008 with operating margins of 28.7% compared to 16.3% in 2008. This is equivalent to an increase of 42.2% compared to adjusted operating income of $38.9 million for 2008, excluding non cash equity compensation charges of $0.05 million and $17.7 million for 2009 and 2008, respectively.

GAAP Net income was $56.4 million for the year ended December 31, 2009, an increase of $35.1 million, or approximately 165.0% compared to last year. Earnings per diluted share were $2.22 vs. $0.85, based on 25.4 and 25.1 million shares outstanding, respectively. Excluding the equity compensation charge and change value of warrant, adjust net income was $57.3 million, or $2.26 per diluted share for 2009.

"We were pleased with the momentum in our wastewater business as we were awarded projects which were approximately double the size of average contracts executed in 2008. With inadequate wastewater infrastructure and existing systems reaching their useful life, we are optimistic about further growth opportunities for this product segment. Mandates by the State Environmental Protection Agency (SEPA) calling for the iron and steel producers to significantly reduce sulphur emissions and specific goals set by China's MIIT to attain this reduction helped drive adoption and enabled us to increase our average contract size for our desulphurization projects by approximately 39% over 2008. As evidenced by our recently announced agreement with Shougang Jingtang Steel Company, we are beginning to implement the BOT model in our desulphurization business, which is aimed at meeting our customer's operating, financial and regulatory objectives, while providing long-term recurring revenue for RINO. We continue to diversify our business through increased sales of anti-oxidation application equipment and the associated coating, and commercialization of our new energy efficient sludge treatment system based on proprietary Rotary Drum Film Dryer ("DWM") technology, which addresses an estimated $28.8 billion market in China, several times larger than that for our existing products. With a strong working capital position, we are well positioned to continue our growth momentum and capitalize this long-term secular growth opportunity in China," stated Mr. Zou Dejun, Director and CEO of RINO.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Balance Sheet and Cash Flow Discussion

Cash and cash equivalents as of December 31, 2009 were $134.5 million, as compared to $19.7 million on December 31, 2008, mainly resulting from the $100 million registered direct offering closed on December 7, 2009. Accounts receivable stood at $57.8 million as of December 31, 2009, compared to $51.5 million reported on December 31, 2008. Days sales outstanding were 110 and 135 for 2009 and 2008, respectively. Inventories and advances for inventory totaled $39.4 million on December 31, 2009, while advances for equipment and construction material purchase were $9.1 million. The Company generated $30.9 million in cash flow from operations, compared with $6.0 million cash generated in operation in 2008. Stockholder's equity increased 205.2% to $204.2 million vs. $66.9 million in 2008, with the associated book value on December 31, 2009 of approximately $8.04 per share.

2010 Guidance

Management expects to report revenues of approximately $225 million for the fiscal year 2010, representing approximately 17% growth over fiscal 2009 results, and gross margins of between 35% and 40% for 2010. On March 31, 2009 the Company had 28,603,321 common shares outstanding. The Company expects to generate revenue growth in all of its business lines, including contribution from its new sludge dehydration project. In addition, management believes its working capital and cash flow from operations will enable it to meet these projections.

22.     On March 31, 2010, RINO filed its Annual Report on Form 10-K with the SEC for the 2009 fiscal year.   The Company's Form 10-K was signed by Defendants Zou, Liu, and Li, and reaffirmed the Company's financial results previously announced on March 31, 2010.  The Company's Form 10-K also contained Sarbanes-Oxley required certifications, signed by Defendants Zou and Liu,

substantially similar to the certifications contained in ¶20, *supra*.

23.     The Company's Form 10-K filed with the SEC on March 31, 2010, in

relevant part, also stated:

Desulphurization Market

In China, the main cause of airborne pollution is sulfur dioxide emissions
from coal. According to joint research by the Chinese Institute of
Environmental Science and Tsinghua University, sulphur
dioxide-induced acid rain costs China over $13.3 billion annually in
various losses, and atmospheric pollution results in an annual loss
equivalent to two or three percent of China's GDP.

In 2005, the latest year for which statistics are available, the Chinese iron
& steel industry discharged 1.24 million metric tons of sulphur dioxide
into the atmosphere. Decades of lightly monitored growth in this
industry sector, with little or no consequences attached to sulphur
dioxide emissions, combined with mandatory, industry-wide sulphur
dioxide reductions over the next few years, presents the industry with a
pressing need to remediate these emissions from iron & steel sinters.

Based on government mandates, over the next few years, coal-fired
sinters and other like furnace operations must install desulphurization
equipment or face stiff, monthly penalties or, possibly, have their
operations shut down. We believe that, because our Desulphurization
System is the only sinter processing equipment available in the PRC
market that is specifically designed for flue gas desulphurization
applications that are larger than 90 square meters - the standard size for
sinter operations in the PRC iron & steel industry - the Company has a
substantial competitive advantage over its international competitors.

Today, there are around 200 coal-fired sinters in China without flue gas
desulphurization equipment (this number is expected to rise along with
the expansion of China's iron and steel industry). Prior to June 2008,
government policy only capped total gas emissions in a geographic area

and there was no restriction on the gas emissions of any individual coal-fired sinter. Accordingly, some coal-fired sinters only had desulphurization equipment that partially treated their gas emissions and some had no desulphurization equipment installed so long as the emission cap in the area was not exceeded. After June 2008, the government tightened gas emission control and is now requiring all coal-fired sinters to have desulphurization equipment installed. This translates into a cumulative market for our desulphurization technology of more than $1 billion in the next few years based on our estimate. We plan to penetrate this market aggressively by marketing the Desulphurization System as a turn-key solution for the Chinese iron & steel industry's sulphur dioxide emission problems.

***Our desulphurization system has been installed in steel mills such as Jinan Iron and Steel Co., Panzhihua Iron & Steel, Shengfeng Iron & Steel, Handan Iron & Steel, Chongqing Iron & Steel. and Kunming Iron & Steel, Hulingnianyuan Iron and Steel, Nanchangchangli Iron & Steel, Qianjing Iron & Steel ,Yuhua Iron & Steel, Zhuhai Yueyufeng Iron & Steel,Hefei Iron &Steel, Jiangsu Xigang Iron &Steel, Zhangdian Iron & Steel and Hunan Lianyuan Iron &Steel . For fiscal years 2008 and 2009, revenues generated from our desulphurization business was $105.3 million and $116.4 million, respectively, representing 75.6% and 60.4% of our total revenues for fiscal years 2008 and 2009, respectively.***

(Emphasis added).

24.    On May 14, 2010, RINO filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal first quarter.  The Company's Form 10-Q was signed by Defendant Zou. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Zou and Wang, substantially similar to the certifications contained in ¶20, *supra*.

25.    On May 17, 2010, the Company issued a press release entitled, "RINO

International Corp. Announces First Quarter 2010 Financial Results." Therein, the

Company, in relevant part, stated:

2010 First Quarter Financial Results

Net revenues for the first quarter ended March 31, 2010 increased 34.4% to $47.9 million as compared to $35.6 million for the first quarter in 2009. Revenue growth was driven by continued growth in demand across its three major product lines. Specifically, the Company recorded $33.9 million in desulphurization revenues, an increase of 32.0% from $25.7 million in same period 2009, with $4.8 million related to the Huanan Lianyuan DXT project; $10.8 million in wastewater treatment system sales, an increase of 49.1% over the first quarter in 2009; and $3.0 million in anti-oxidation equipment and coatings as compared to $2.4 million recorded in the same period in 2009.

Cost of sales for the first quarter of 2010 was $31.2 million as compared to $19.7 million in same period 2009, an increase of 58.5%. Gross profit was $16.7 million in the first quarter of 2010 as compared to $16.0 million for the same period in 2009, an increase of $0.7 million or 4.7%, representing gross margins of approximately 34.9% and 44.8%, respectively. The decrease in gross margins was due to increased steel costs, in addition to higher levels of outsourced production during the first quarter to meet project implementation timelines. The Company incurred $5.8 million in outsourcing expense for the three months ended March 31, 2010 as compared to $0.9 million in the same period in 2009.

Total operating expenses for the first quarter of 2010 were $6.8 million as compared to $3.4 million for the same period in 2009. The increase in operating expenses was primarily due to increased sales commissions associated with larger contracts. Operating margins were 20.6% for the first quarter of 2010 as compared to 35.3% for the first quarter of 2009.

The Company's effective tax rate for 2010 is 7.3%, resulting in a provision of $1.5 million, or $.05 per share, for the first quarter of 2010, compared to none in the same period in 2009.

GAAP net income for the first quarter of 2010 was $18.7 million, representing an increase of 49.6% as compared to $12.5 million reported in the same period in the prior year. GAAP earnings were $0.65 per diluted share for the first quarter of 2010 as compared to $0.50 per diluted share for the same period last year, based on 28.6 million and 25.0 million weighted average shares outstanding, respectively. Excluding a $10.2 million gain for the change in the fair value of warrants and $19,496 stock compensation expense for the first quarter of 2010, adjusted net income (Non-GAAP) was $8.5 million, with adjusted earnings per diluted share of $0.30.

"During the first quarter of 2010, we delivered measured revenue growth through the execution of several major projects, including both desulphurization and wastewater treatment systems," commented Mr. Zou Dejun, President and CEO of RINO International. "We are pleased with the momentum in our business as evidenced by our backlog and expect a robust second half of the year as the State Environmental Protection Agency (SEPA) maintains a supportive policy to reduce the sulphur emissions for iron and steel producers, while aging wastewater infrastructure systems force prospective customers to accelerate purchase decisions. We are confident in meeting our projects for $225 million in revenue for 2010, representing 17% growth over 2009.

Increased demand for company resources, coupled with capacity constraints led to more outsourcing during the first quarter which compressed margins, but our prudent cost management kept gross margins within the Company's target of 35% to 40%. In addition, RINO incurred significantly higher sales commissions due to a larger number of contracts and higher associated fees due to higher average contract price. Construction commenced on a new large scale industrial production facility on the 57.5 acres we recently secured in Dalian Changxing Island Harbor Industrial Zone. This facility will be used to expand the Company's manufacturing capacity by over 300% and R&D capabilities for our entire line of environmental protection equipment and is expected to come on-line in phases commencing September 2010 and to be completed by May 2011.

During the first quarter, we began the installation for the Company's first BOT desulphurization project with Shougang Jingtang Steel Company,

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

continued the DXT desulphurization system installation for Hunan Lianyuan Iron and Steel Company and commenced construction of the sludge treatment facility for the city of Dalian."

"With the proceeds from the $100 million equity financing in December, we have the necessary working capital to expand our production capacity while leveraging incremental working capital to secure additional projects as demand continues to be driven by environmental and regulatory trends and economic growth in China," Mr. Zou concluded.

Balance Sheet and Cash Flow Discussion

Cash and cash equivalents as of March 31, 2010 were $97.7 million, representing a decrease of 27.4% as compared to $134.5 million as of December 31, 2009. At the end of the quarter the Company had working capital of 231.8 million and a current ratio of 7.1 to 1. Accounts receivable stood at $52.3 million, a 9.6% decrease from $57.8 million reported as of December 31, 2009. Days sales outstanding stood at 105 compared to 104 at the end of last year. As of March 31, 2010, the Company had $8.1 million in long-term loans and $3.7 million in short term loans. Stockholder's equity increased 9.2% to $223.0 million as of March 31, 2010 as compared to $204.2 million as of December 31, 2009.

For the first quarter in 2010, cash used in operations totaled $38.2 million as compared to $27.6 million cash provided by operations for the first quarter in 2009, which was mainly due to an increase in advances for inventory purchases to support additional projects and an increase in costs and estimated earnings in excess of billings on uncompleted contracts.

Backlog as of March 31, 2010

Backlog, defined as unfinished projects, as of March 31, 2010 was $110.5 million with the breakdown detailed in the table below. The Company expects that 50% of this will turn into revenue by the end of the second quarter.

---

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Product Segment | Amount ($ millions) |
|---|---|
| 1. Desulphurization Systems | 67.7 |
| 2. Wastewater Treatment | 22.3 |
| 3. Anti-oxidation Systems | 1.8 |
| 4. Municipal Sludge Treatment | 18.7 |
| Total | 110.5 |

Recent Events

-- On May 10 Mr. Zou and Ms. Qiu repaid the $3.5 million short-term loan plus interest which was made on March 31, 2010.

-- On May 3 the Company appointed Mr. Ben Wang as Chief Financial Officer and Mr. Harold Epps as Chief Strategic Officer to assist with the international growth plan

26. On August 16, 2010, the Company issued a press release entitled, "RINO Announces Second Quarter 2010 Financial Results." Therein, the Company, in relevant part, stated:

DALIAN, China, Aug. 16 /PRNewswire-Asia-FirstCall/ -- RINO International Corporation (the "Company" or "RINO") (Nasdaq:RINO), a leading provider of clean technology solutions to China's iron and steel industry, announced today its unaudited financial results for the second quarter ended June 30, 2010.

Second Quarter Highlights
-- Total revenues in the second quarter of 2010 were $65.4 million, a 60.6% increase from the corresponding period in 2009.
-- Operating profit in the second quarter of 2010 was $18.1 million, a 80.5% increase from the corresponding period in 2009.
-- Net income in the second quarter of 2010 was $20.4 million, a 107.4% increase from the corresponding period in 2009. Net income excluding change in fair value of warrant (non-GAAP) was $15.5 million, a 33.0% increase from the corresponding period in 2009.

-- Diluted earnings per share ("EPS") for the second quarter of 2010 was $0.71. Diluted EPS excluding change in fair value of warrant (non-GAAP) was $0.54, a 16.6% increase from $0.47 for the corresponding period in 2009.

"We are pleased to announce strong results for the second quarter 2010," said Mr. Dejun Zou, director and chief executive officer of RINO. "The robust year-over-year revenue increase was primarily driven by steady growth in our two main business segments, core flue gas desulphurization and waste water treatment systems. Going forward, the primary objective for our core business segments is to continue expanding our market share and enhance gross margin. At the same time, we will build out other business segments that are synergistic extensions of our core competence. Municipal sludge treatment, for instance, is an area of our near-term focus."

"China's clean technology industry is growing rapidly with government support. Policies and guidelines that call for increasingly stricter standards for industrial waste treatment continuously drive up demand for a greater scope of treatments as well as volume. RINO's future success depends on our ability to continue enhancing our production capacity and technological capability to keep up with industry developments. We are confident that with our focused efforts on these fronts and effective execution we will continue to be a leading player in the industry of our fundamental business segments and successfully expand into high growth segments in the future," Mr. Zou concluded.

Mr. Ben Wang, chief financial officer of RINO, added, "Both top and bottom line results were very strong in the second quarter and we are on track to achieve our targets for fiscal year 2010. For the rest of the year we will continue to enhance operational systems while investing for sustainable growth in the long term. We are also progressing according to our schedule to further strengthen our internal control and to continue to comply with Sarbanes Oxley requirements."

2010 Second Quarter Results

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RINO reported total revenues of $65.4 million for the second quarter of 2010, representing a 60.6% increase from the corresponding period in 2009. Revenue growth was driven by the continued growth across the Company's major product lines. Specifically, the Company recorded $42.4 million in revenues from the desulphurization business, an increase of 41.0% from $30.1million in the same period of 2009; $15.0 million from wastewater treatment system sales, an increase of 61.7% over the second quarter of 2009; and $7.1 million in anti-oxidation equipment and coatings as compared to $1.1 million recorded in the same period of 2009.

Cost of sales for the second quarter of 2010 was $42.3 million as compared to $26.6 million in the same quarter of 2009, an increase of 59.3%. Gross profit was $23.1 million in the second quarter of 2010 compared to $14.2 million for the same period of 2009, an increase of 62.9%, and representing gross margins of 35.3% and 34.8%, respectively. The Company expects gross margin to be in the mid thirties range for the remainder of the year. Outsourcing costs for the second quarter 2010 were $4.3 million, an increase of 2745% from $0.2 million in the same period of 2009.

Total operating expenses for the second quarter of 2010 were $5.0 million as compared to $4.2 million for the same period in 2009. The increase in operating expenses was primarily due to increased sales commissions associated with the increased volume of contracts. Operating margin was 27.6% for the second quarter of 2010 as compared to 24.6% for the second quarter of 2009. The fluctuation in operating margins is associated with sales commissions being paid upon contract signing, while contract revenues are recognized in stages during the project using the percentage-of-completion method.

Share-based compensation expenses, which were allocated to the related operating costs and expenses line items, increased in aggregate to $46,036 in the second quarter of 2010 from $9,263 in the corresponding period in 2009. The increase in share-based compensation expenses was primarily due to additional options granted to staff and a board member.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Income tax expense provision was $2.5 million, or $0.09 per share, for the second quarter of 2010, compared to nil in the same period in 2009. The Company's effective tax rate for 2010 is 10.9% compared to 0% for 2009.The increase in effective tax rate was primarily due to Dalian Innomind Environment Engineering Co., Ltd., a wholly owned subsidiary of the Company, reaching the end of its tax-free holiday and entering a phase in which it is subject to a fifty percent tax shelter (12.5%) for the years of 2010, 2011and 2012.

Net income for the second quarter of 2010 was $20.4 million, representing an increase of 107.4% as compared to $9.9 million reported in the same period in the prior year. Diluted earnings per share were $0.71 for the second quarter of 2010 as compared to $0.39 for the same period last year, based on 28.6 million and 25.1 million weighted average shares outstanding, respectively. Non-GAAP net income, which is net income excluding a $4.9 million gain from the change in the fair value of warrants for the second quarter of 2010, was $15.5 million, translating to non-GAAP diluted EPS of $0.54.

Balance Sheet and Cash Flow Discussion

Cash and cash equivalents as of June 30, 2010 were $88.0 million, representing a decrease of 34.5% as compared to $134.5 million as of December 31, 2009. At the end of the second quarter, the Company had working capital of $245.2 million and a current ratio of 11 to 1.

Accounts receivable stood at $68.4 million, an 18.3% increase from $57.8 million reported as of December 31, 2009. Days sales outstanding for the first two quarters of 2010 was 102 days compared with 124 days for the same period of 2009. As of June 30, 2010, the Company had $8.1 million in long-term loans and $3.7 million in short term loans. Stockholder's equity increased 19.8% to $244.5 million as of June 30, 2010 as compared to $204.2 million as of December 31, 2009.

For the first six months of 2010, cash used in operations totaled $48.3 million as compared to $9.7 million cash provided by operations for the first six months of 2009, mainly due to an increase in advances for

inventory purchases to support additional projects, an increase in costs and estimated earnings in excess of billings on uncompleted contracts, and change in fair value of warrants.

Backlog as of June 30, 2010

Backlog, defined as projects for which contracts have been signed but which have not been completed or started, as of June 30, 2010 was $104.7 million. The Company expects that approximately 50% of the currently backlogged contracts will be executed and recognized as revenue by the end of the third quarter, 2010.

| Product Segment | Amount ($ millions) |
| --- | --- |
| 1. Desulphurization Systems | 70.8 |
| 2. Wastewater Treatment | 14.6 |
| 3. Anti-oxidation Systems | 0.4 |
| 4. Municipal Sludge Treatment | 18.9 |
| Total | 104.7 |

Recent Business Updates

Approval for new bank loan

In August 2010, RINO received a letter of approval from the Agricultural Bank of China for a business loan in the amount of $ 44.2 million (RMB 300 million) to be used to purchase fixed assets. The Company plans to use funding from this loan for the Changxing Island Project as needed.

Outlook for Fiscal Year 2010

RINO continues to expect to generate total revenues in an amount ranging from $221.0 million to $229.0 million for fiscal year 2010, representing an increase of 15% - 19% from 2009. This forecast reflects RINO's current and preliminary view, which will be subject to future changes.

27.     On August 16, 2010, RINO filed its Quarterly Report on Form 10-Q with the SEC for the 2010 fiscal second quarter.  The Company's Form 10-Q was signed by Defendant Zou, and reaffirmed the Company's financial results previously announced on August 16, 2010. The Company's Form 10-Q also contained Sarbanes-Oxley required certifications, signed by Defendants Zou and Wang, substantially similar to the certifications contained in ¶20, *supra*.

28.     The statements contained in ¶¶19-27 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that certain customers did not purchase FGD systems as the Company had previously claimed; (2) that the Company's financial results reported to China's State Administration of Industry and Commerce were substantially less than the financial results the Company reported to the public and contained in the financial statements RINO filed with the SEC; (3) that the Company lacked adequate internal and financial controls; and (4) that, as a result of the foregoing, the Company's financial results were materially false and misleading at all relevant times.

## **Disclosures at the End of the Class Period**

29.     On November 10, 2010, a research firm published a research report on RINO.  A summary of the report on the research firm's website states:

RINO claims to be the leader in selling desulfurization ("FGD") and

other environmental equipment to Chinese steel mills. It reported 2009 revenue of $193 million. In reality its revenue is under $15 million, and its management has diverted tens of millions of dollars for its own use. We value RINO based on the cash we believe remains in the company after the most recent raise.

• RINO's FGD sales (60% to 75% of revenue) are much lower than it claims. We found that many of its customer relationships do not exist.

• Chinese regulatory filings show that RINO's consolidated 2009 revenue was only $11 million, or 94.2% lower than it reported in the US. We show that the Chinese numbers are credible.

• RINO's accounting has serious flaws that are clear signs of cooked books.

• RINO's management is draining cash from the company for its own business and personal uses. The management is in flagrant breach of its VIE agreements, which require it to pay income to RINO (as opposed to taking it).

• RINO's balance sheet has an astonishingly small amount of tangible assets for a manufacturer. Rather, it is filled with low quality "paper" assets that balance out the inflated earnings, and likely hide leakage.

• RINO is not the industry leader it claims to be in the steel sinter FGD system market. Rather, it is an obscure company in a crowded field, and is best known for its failed projects. Its reported margins are two to three times what they really are. Its technology is sub-par.

• We are not sanguine about management "borrowing" $3.2 million to purchase a luxury home in Orange County, CA the day that RINO closed its $100.0 million financing.

30.     On this news, shares of RINO declined $2.34 per share, more than 15%, to close on November 10, 2010, at $13.18 per share, on unusually high volume.

31.     On November 11, 2010, the Company issued a press release entitled, "RINO Comments on Muddy Waters Allegations." Therein, the Company, in relevant part, stated:

**Company to provide detailed response upon completion of internal review**

**Company will announce financial results for the third quarter 2010 on November 15 as scheduled**

DALIAN, China, Nov. 11, 2010 /PRNewswire-Asia-FirstCall/ -- RINO International Corporation (the "Company" or "RINO") (Nasdaq:RINO), a leading provider of clean technology solutions to China's iron and steel industry, commented today on the allegations against the Company made by Muddy Waters, LLC ("Muddy Waters") concerning RINO's business practices.

RINO takes its responsibilities to investors very seriously and has launched an internal review of Muddy Waters' allegations. RINO looks forward to providing investors with a timely and detailed response to the allegations upon completion of its internal review.

RINO is scheduled to report its unaudited financial results for the third quarter ended September 30, 2010, after the U.S. market closes on November 15, 2010. RINO's management will hold an earnings conference call at 7 PM on November 16, 2010 U.S. Eastern Time (8 AM on November 17, 2010 Beijing/Hong Kong time), at which time management will comment on the allegations to the extent possible based on the progress of internal review but will not hold a question and answer session.

1  (Emphasis in original).

2      32.     On this news, shares of RINO declined $2.08 per share, more than 15%,

3

4  to close on November 11, 2010, at $11.10 per share, on unusually high volume.

5      33.     On November 15, 2010, the Company issued a press release entitled,

6

7  "RINO Announces Third Quarter 2010 Financial Results."  Therein, the Company,

8  in relevant part, stated:

9      DALIAN, China, Nov. 15, 2010 /PRNewswire-Asia-FirstCall/ -- RINO
       International Corporation (the "Company" or "RINO") (Nasdaq:RINO),
10      a leading provider of clean technology solutions to China's iron and steel
       industry, announced today its unaudited financial results for the third
11      quarter ended September 30, 2010.
12

13      Third Quarter Highlights

14
       *   Total revenues in the third quarter of 2010 were $52.7 million, a
15            16.7% decrease from the corresponding period in 2009.

16
       *   Operating profit in the third quarter of 2010 was $9.9 million, a
17            49.3% decrease from the corresponding period in 2009.
18

19      *   Net income in the third quarter of 2010 was $8.8 million, a 48.3%
20            decrease from the corresponding period in 2009. Net income
       excluding change in fair value of warrants (non-GAAP) was $8.7
21            million, a 55.6% decrease from the corresponding period in 2009.
22

23      *   Diluted earnings per share ("EPS") for the third quarter of 2010
24            was $0.31. Diluted EPS excluding change in fair value of warrants
       (non-GAAP) was $0.31, a 60.8% decrease from $0.78 for the
25            corresponding period in 2009.
26

27

28

"Revenues in the third quarter were down due to recent reform in the steel industry which has caused a 'wait and see' approach toward capex including investment in clean technologies," said Mr. Dejun Zou, director and chief executive officer of RINO. "We are also seeing our clients experiencing a tightening of cash flow which has led to an increase in accounts receivable. However we still have a full order book with several new contracts successfully negotiated as well as backlog from the third quarter which will generate revenues in the fourth quarter."

"We believe that despite the temporary market downturn, the long-term industry environment remains very encouraging with increasing government pressure coming to bear on polluting industries and demand getting even stronger," Mr. Zou continued. "We are racing to meet that demand by expanding capacity and investing in advanced technology to help us solidify our leading position. At the same time we are continuing to look for opportunities to expand outside our traditional de-sox and wastewater treatment segments to capture market share in new high growth areas."

"After a weaker than expected third quarter we are revising our full year guidance to reflect the disruption caused by industry consolidation. However we remain confident in our long-run prospects and are moving ahead with several projects to drive revenues in the future. We are continuing to work to improve internal controls and we remain focused on fulfilling Sarbanes-Oxley requirements according to schedule," Mr. Zou concluded.

2010 Third Quarter Results

RINO reported total revenues of $52.7 million for the third quarter of 2010, representing a 16.7% decrease from the corresponding period in 2009. Revenue decrease was caused by the decrease in our wastewater treatment and anti-oxidation businesses. Specifically, the Company recorded $43.0 million in revenues from the desulphurization business, an increase of 29.1 % from $33.3million in the same period of 2009; $7.5 million from wastewater treatment system sales, a decrease of

50.6% over the third quarter of 2009; and $1.7million in anti-oxidation equipment and coatings as compared to $13.8 million recorded in the same period of 2009.

Cost of sales for the third quarter of 2010 was $36.4 million as compared to $37.2 million in the same quarter of 2009, a decrease of 2.0%. Gross profit was $16.3 million in the third quarter of 2010 compared to $26.1 million for the same period of 2009, a decrease of 37.7%, and representing gross margins of 30.9% and 41.3%, respectively. The decreases in gross margins were mainly attributable to increases in the costs of outsourcing. Outsourcing costs for the third quarter of 2010 were $9.7 million, of which $5.7 million were incurred by the Shougang Jingtang Project using a cost recovery method, representing an increase of 164.8% from $3.7 million in the same period of 2009.

Total operating expenses for the third quarter of 2010 were $6.4 million as compared to $6.6 million for the same period in 2009. The decrease in operating expenses was primarily due to decrease in sales commission expenses. Operating margin was 18.8% for the third quarter of 2010 as compared to 30.9% for the third quarter of 2009. The decrease of operating margin was mainly due to the intensive competition in desulphurization market, which leads to our reduced gross margin. At the same time, revenue from the Shougang Jingtang Project is recognized using a cost recovery method and no gross margin was recognized during the three months ended September 30, 2010.

Stock compensation expenses, which were allocated to related operating costs and expenses line items, increased in aggregate to $325,937 in the third quarter of 2010 from ($9,263) in the corresponding period in 2009. The increase in share-based compensation expenses was primarily due to additional options granted to staff and board members.

Income tax expense provision was $1.5 million, or $0.05 per share, for the third quarter of 2010, compared to nil in the same period in 2009. The Company's effective tax rate for the third quarter of 2010 is 14.5% compared to 0% for the same period in 2009. As a foreign investment enterprise, and the only taxable entity within the Company in the third

quarter of 2010, Dalian Innomind Environment Engineering Co., Ltd., is qualified for an income tax exemption for 2008 and 2009, and a 50% reduction from the normal income tax rate of 25% for the three years from 2010 through 2012.

Net income for the third quarter of 2010 was $8.8 million, representing a decrease of 48.3% as compared to $17.1 million reported in the same period in the prior year. Diluted earnings per share were $0.31 for the third quarter of 2010 as compared to $0.68 for the same period in 2009, based on 28.6 million and 25.2 million weighted average shares outstanding, respectively. Non-GAAP net income, which is net income excluding a $97,620 gain from the change in the fair value of warrants for the third quarter of 2010, was $8.7 million, translating to non-GAAP diluted EPS of $0.31.

Balance Sheet and Cash Flow Discussion

Cash and cash equivalents as of September 30, 2010 were $56.1 million, representing a decrease of 58.3% as compared to $134.5 million as of December 31, 2009. At the end of the third quarter, the Company had working capital of $245.0 million and a current ratio of 7.1.

Accounts receivable stood at $112.0 million, a 93.8% increase from $57.8 million reported as of December 31, 2009. Accounts receivable days sales outstanding stood at 138 days compared to 111 days at the end of last year. As of September 30, 2010, the Company had $8.2 million in long-term loans and $3.7 million in short term loans. Stockholder's equity increased 26.4% to $258.1 million as of September 30, 2010 as compared to $204.2 million as of December 31, 2009.

For the first nine months of 2010, cash used in operations totaled $67.6 million as compared to $8.4 million cash provided by operations for the first nine months of 2009, mainly due to an increase in accounts receivable, advances for inventory purchases to support additional projects, and costs and estimated earnings in excess of billings on uncompleted contracts.

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Backlog as of September 30, 2010

Backlog, defined as unfinished projects, includes any projects that the Company has undertaken but hasn't yet commenced. As of September 30, 2010, backlog amounted to $56.3 million (VAT excluded), the breakdown of which is set forth in the following table. The Company expects that approximately 75% of the backlog will turn into revenue by the end of 2010.

*       *       *

Outlook for Fiscal Year 2010

Affected by reform and contracting cash flows in the iron & steel industry in China, the company is expecting softer demand for its services in the immediate future. Based on analysis of current market demand, the company estimates its total revenue for fiscal year 2010 to range from $203.0 million to $211.0 million, down from the previously estimated range of $221.0 to $229.0 million, representing a year over year increase of 5.4% to 9.6%.

34.     Thereafter, an analyst at Canaccord Genuity cut its rating on RINO to "Sell," citing the allegations of fraud and the Company's initiation of an internal review.  According to a Bloomberg news story:

Nov. 15 (Bloomberg) -- Rino International's real business may be smaller than reported, Canaccord Genuity analyst Michael Deng said in a note.

*       Allegations of fraud from Muddy Waters report may be hard to clear, Deng said
*       Muddy Waters report claimed 6 of 9 FGD customers denied hiring RINO, Canaccord's checks with Yueyufeng also contradict RINO's explanation: Deng
*       RINO launched internal review of Muddy Water allegations Nov.

---

11
* RINO rated sell, no PT at Canaccord Genuity
* 1 buy, 1 hold, 1 sell, avg. PT $29: Bloomberg data
* RINO down 32% in a week, Nasdaq 100 down 2.3%

35. On this news, shares of RINO declined $3.46 per share, or 31.43%, to close on November 15, 2010, at $7.55 per share, on unusually high volume.

## CLASS ACTION ALLEGATIONS

36. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons or entities who purchased RINO securities between November 13, 2009 and November 11, 2010, inclusive (the "Class Period"), and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

37. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, RINO securities were actively traded on the National Association of Securities Dealers Automated Quotations Market ("NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes

that there are hundreds or thousands of members in the proposed Class.  Millions of RINO shares were traded publicly during the Class Period on the NASDAQ and as of August 13, 2010, the Company had 28,605,321 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by RINO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

38.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

39.     Plaintiff will fairly and adequately protect the interests of the  members of the Class and has retained counsel competent and experienced in class and securities litigation.

40.     Common questions of law and fact exist as to all members of the  Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public

during the Class Period omitted and/or misrepresented material facts about the operations, financial performance and prospects of RINO; and

(c)     To what extent the members of the Class have sustained damages and the proper measure of damages.

41.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

42.     The market for RINO securities was open, well-developed and efficient at all relevant times.   As a result of these materially false and/or misleading statements, and/or failures to disclose, RINO securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired RINO securities relying upon the integrity of the market price of the Company's securities and market information relating to RINO, and have been damaged thereby.

43.     During the Class Period, Defendants materially misled the investing

public, thereby inflating the price of RINO securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about RINO' business, operations, and prospects as alleged herein.

44.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about RINO's financial performance and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

1

2

3

4

## LOSS CAUSATION

45.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

46.    During the Class Period, Plaintiff and the Class purchased RINO securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors's losses.

## SCIENTER ALLEGATIONS

47.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding RINO, his/her control over, and/or receipt and/or modification of RINO's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

information concerning RINO, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
### (FRAUD-ON-THE-MARKET DOCTRINE)

48.     The market for RINO securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, RINO securities traded at artificially inflated prices during the Class Period.  On November 30, 2009, the Company's stock closed at a Class Period high of $34.25 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of RINO securities and market information relating to RINO, and have been damaged thereby.

49.     During the Class Period, the artificial inflation of RINO stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about RINO's financial performance and prospects.  These material misstatements and/or omissions created an unrealistically positive assessment of RINO and its business, operations, and financial performance, thus causing the price of the Company's securities to be

artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

50. At all relevant times, the market for RINO securities was an efficient market for the following reasons, among others:

(a) RINO stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, RINO filed periodic public reports with the SEC and the NASDAQ;

(c) RINO regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) RINO was followed by securities analysts employed by major brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.

Each of these reports was publicly available and entered the public marketplace.

51.     As a result of the foregoing, the market for RINO securities  promptly digested current information regarding RINO from all publicly available sources and reflected such information in RINO's stock price. Under these circumstances, all purchasers of RINO securities during the Class Period suffered similar injury through their purchase of RINO securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

52.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking

statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of RINO who knew that the statement was false when made.

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against All Defendants

53.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

54.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase RINO's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

55.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of

the Company's securities in an effort to maintain artificially high market prices for RINO's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

56.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about RINO's financial well-being and prospects, as specified herein.

57.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of RINO's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about RINO and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

58.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

59.    The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing

RINO's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

60.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of RINO securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired RINO securities during the Class Period at artificially high prices and were damaged thereby.

61.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.

Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the Company's improper accounting practices, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their RINO securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

63. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

64. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65. The Individual Defendants acted as controlling persons of RINO within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false

financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

66.   In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

67.   As set forth above, RINO and the Individual Defendants each  violated either Section 10(b) and Rule 10b-5, by their acts and/or omissions as alleged in this Complaint.   By virtue of their positions  as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities

1   during the Class Period.

2
        **PRAYER FOR RELIEF**
3

4       WHEREFORE, Plaintiff prays for relief and judgment, as follows:

5       (a)     Determining that this action is a proper class action under Rule 23 of
6
    the Federal Rules of Civil Procedure;
7

8       (b)     Awarding compensatory damages in favor of Plaintiff and the other Class
9
    members against all defendants, jointly and severally, for all damages sustained as a
10
    result of Defendants' wrongdoing, in an amount to be proven at trial, including interest
11
12  thereon;

13
        (c)     Awarding Plaintiff and the Class their reasonable costs and expenses
14
15  incurred in this action, including counsel fees and expert fees; and

16      (d)     Such other and further relief as the Court may deem just and proper.

17
        **JURY TRIAL DEMANDED**
18

19      Plaintiff hereby demands a trial by jury.

20  DATED: November 15, 2010              **GLANCY BINKOW & GOLDBERG LLP**

21

22                                       By:    _____

23

24                                              Lionel Z. Glancy
                                                Michael Goldberg
25                                              Robert V. Prongay
                                                1801 Avenue of the Stars, Suite 311
26

27
    _____
    COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS
28

1

2

Los Angeles, California 90067
Telephone: (310) 201-9150

3

**LAW OFFICES OF HOWARD G. SMITH**

4

Howard G. Smith

5

3070 Bristol Pike, Suite 112
Bensalem, PA 19020

6

Telephone: (215) 638-4847
Facsimile: (215) 638-4867

7

8

*Attorneys for Plaintiff Ali Baig*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SWORN CERTIFICATION OF PLAINTIFF

RINO International Corporation, SECURITIES LITIGATION

I, Ali Baig, certify that:

1. I have reviewed the complaint and authorized its filing.

2. I did not purchase RINO International Corporation, the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in RINO International Corporation, during the class period set forth in the Complaint are as follows:

   I bought __350__ shares on _10_/_14_/_10_ at $_11.31_ per share.
   I bought __250__ shares on _10_/_14_/_10_ at $_11.28_ per share.
   I bought _____ shares on ___/___/___ at $____ per share.
   I bought _____ shares on ___/___/___ at $____ per share.
   I bought _____ shares on ___/___/___ at $____ per share.

   I sold _____ shares on ___/___/___ at $____ per share.
   I sold _____ shares on ___/___/___ at $____ per share.
   I sold _____ shares on ___/___/___ at $____ per share.
   I sold _____ shares on ___/___/___ at $____ per share.
   I sold _____ shares on ___/___/___ at $____ per share.

   (List Additional Transactions on a Separate Page if Necessary)

5. I have not served as a representative party on behalf of a class under this title during the last three years except as stated:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

   ___☐ Check here if you are a current employee or former employee of the defendant Company.

   I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: __11/12/10__

_____
(Please Sign Your Name Above)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge Cormac J. Carney  and the assigned discovery Magistrate Judge is Robert N. Block.

The case number on all documents filed with the Court should read as follows:

## SACV10- 1754 CJC (RNBx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[ ] **Western Division**
    **312 N. Spring St., Rm. G-8**
    **Los Angeles, CA 90012**

[X] **Southern Division**
    **411 West Fourth St., Rm. 1-053**
    **Santa Ana, CA 92701-4516**

[ ] **Eastern Division**
    **3470 Twelfth St., Rm. 134**
    **Riverside, CA 92501**

Failure to file at the proper location will result in your documents being returned to you.

Name & Address:
Robert V. Prongay (#270796)
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Email: Info@glancylaw.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI BAIG, Individually and on Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>RINO INTERNATIONAL CORPORATION, DEJUN ZOU, BEN WANG, YI LIU a/k/a JENNY LIU, and YU LI<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV10-1754 CJC(RNBx)**<br><br>**SUMMONS** |

TO:   DEFENDANT(S): RINO INTERNATIONAL CORPORATION, DEJUN ZOU, BEN WANG,
          YI LIU a/k/a JENNY LIU, and YU LI

   A lawsuit has been filed against you.

   Within   21   days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, Robert V. Prongay_____, whose address is 1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: November 15, 2010

By:   N. Bostms
        Deputy Clerk

        (Seal of the Court)

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

Name & Address:
Robert V. Prongay (#270796)
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067
Email: Info@glancylaw.com

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALI BAIG, Individually and on Behalf of All Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>RINO INTERNATIONAL CORPORATION, DEJUN ZOU, BEN WANG, YI LIU a/k/a JENNY LIU, and YU LI<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**SACV10-1754 CJC(RNBx)**<br><br><br>**SUMMONS** |

TO:   DEFENDANT(S): <u>RINO INTERNATIONAL CORPORATION, DEJUN ZOU, BEN WANG,</u>
<u>   YI LIU a/k/a JENNY LIU, and YU LI</u>

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, <u>Robert V. Prongay</u>, whose address is <u>1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067</u>. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: <u>November 15, 2010</u>

By: <u>N. Boatme</u>
       Deputy Clerk

       *(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
ALI BAIG, Individually and on Behalf of
All Others Similarly Situated,

**DEFENDANTS**
RINO INTERNATIONAL
CORPORATION, DEJUN ZOU, BEN
WANG, YI LIU a/k/a JENNY LIU, and YU LI

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

Robert V. Prongay
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311, Los Angeles, CA 90067  T. (310) 201-9150

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated or Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No    ☒ **MONEY DEMANDED IN COMPLAINT: $** To be proved

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Violation of Sections 10-b and Rule 10b(5) and 20A of the 1934 Securities Exchange Act

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | REAL PROPERTY | | ☐ 640 R.R. & Truck | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 210 Land Condemnation | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | IMMIGRATION | | ☐ 690 Other | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | ☐ 463 Habeas Corpus- Alien Detainee | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | ☐ 465 Other Immigration Actions | | | |

---

**FOR OFFICE USE ONLY:**    Case Number: ___    **SACV10-1754 CJC(RNBx)**

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑No   ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)   ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
         ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
         ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
         ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Broward County, Florida |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | Jinzhou District, Dalian, China |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
 **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, CA | |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
**Note: In land condemnation cases, use the location of the tract of land involved**

X. SIGNATURE OF ATTORNEY (OR PRO PER). _____   Date  November 15, 2010

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended.  (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |